GRISWOLD AND RAUMA, ARCHITECTS, INCORPORATED, v. AESCULAPIUS CORPORATION.

221 N. W. 2d 556.

September 6, 1974—No. 44566.

*Lindquist & Vennum* and *Norman L. Newhall,* for appellant.
*Murnane, Murnane, Battis & Conlin* and *Thomas J. Battis,* for respondent.

Heard before Peterson, Kelly, and Yetka, JJ., and considered and decided by the court en banc.

PETERSON, JUSTICE.

Plaintiff brought this action to enforce and foreclose a lien for $19,438.65 for architectural services provided defendant. Defendant answered by denying that it owed plaintiff anything and filed a counterclaim to recover $17,436.04 already paid plaintiff, defendant's theory being that plaintiff was entitled to no fee because it breached its contract by grossly underestimating the probable cost of construction of the as yet unbuilt building. The trial court found for defendant. We reverse, for reasons requiring an extended recital of the factual setting out of which the litigation arose.

Plaintiff is a corporation engaged in providing architectural services. Defendant is also a corporation, the principal stockholders of which are Drs. James Ponterio, P. J. Adams, and A. A. Spagnolo. Defendant owns a medical building in Shakopee which

it rents to the Shakopee Clinic, which in turn is operated by Drs. Ponterio, Adams, and Spagnolo.

In early 1970 defendant decided to expand the Shakopee Clinic to allow for a larger staff of doctors. As a result the members of the corporation and their business manager, Frank Schneider, contacted various architectural firms and selected plaintiff.

At his first meeting with the doctors in February or March 1970 David Griswold, one of plaintiff's senior architects, was shown a rough draft of the proposed addition and given a very general idea of what the doctors wanted. Although the evidence is conflicting, it appears that at this meeting the doctors talked in general terms of a budget of about $300,000 to $325,000.

After a number of subsequent conferences with the doctors and Mr. Schneider, plaintiff prepared and delivered to the doctors on May 8, 1970, a document entitled "Program of Requirements." This document, which outlined and discussed the requirements of the project as then contemplated, contained the following final section:

"BUDGET:

"The design to evolve from this program will indicate a certain construction volume that can be projected to a project cost by the application of unit (per square foot and per cubic foot) costs; and eventually, as the design is developed in detail, by an actual materials take-off. Inevitably the projected cost must be compatible with a budget determined by available funds. It is obvious that adjustment of either the program or the budget may be necessary and that possibility must be recognized.

"The project budget established, as currently understood, is $300,000. It has not been stated if this is intended to include non-building costs such as furnishings, equipment and fees—which may be approximately 25% of the total expenditure—as well as construction costs. Advice in this respect will eventually be necessary.

"The essential principle to be considered in the design develop-

ment is as previously stated in the paragraphs of the section titled PROJECT OBJECTIVES.

"The construction shall be as economical as possible within the limitations imposed by the desire to build well and provide all of the facility required for a medical service."

In spite of the suggestion at the end of the second paragraph quoted above, neither party at any time thereafter sought to define more particularly what the budget was intended to include. Mr. Schneider testified, however, that he believed the original budget figure included the cost of construction, architects' fees, and the remodeling of the old building. In contrast, Dr. Ponterio testified that it was his belief that the original budget figure did not include a communications system valued at $12,755, architects' fees, or the $20,000 remodeling of the existing building.

On or about May 22, 1970, plaintiff submitted to defendant two alternate preliminary plans, designated SK-1 and SK-2. Plan SK-1 projected the programmed services to be housed partly in the existing building and partly in the new building. Plan SK-2 projected the programmed services as being housed entirely in the new building. Plan SK-2, as specifically shown on the plans, involved a larger plan in terms of area than SK-1. Defendant indicated its preference for plan SK-2, the larger and more elaborate of the two.

On June 1, 1970, plaintiff provided defendant with a "Cost Analysis" of the plan chosen by defendant. This cost analysis showed the dimensions of the project in square feet as then contemplated, and computed the cost of the project at two different rates per square foot. At the higher rate per square foot, the cost came to $322,140, plus an estimated $20,000 for remodeling the old building, totaling $342,140. At the lesser rate per square foot, the cost came to $284,575, plus $15,000 for the remodeling of the old building, totaling $299,575. The cost analysis memorandum also noted that "the best procedure for projecting costs is by a materials take-off" which was to be done "when sufficient information is available."

It is undisputed that subsequent to the June 1, 1970, cost estimate, no further cost estimates were ever conveyed to defendant. What is disputed is whether in the ensuing months there was any discussion as to whether the project was coming within the budget. According to the testimony of Mr. Schneider, defendant was assured at all times during the preparation of the building plans and in all discussions with Griswold that the construction would come within the budget. Dr. Ponterio also emphasized that Griswold constantly mentioned the budget figure of $300,000 at their meetings. Griswold, however, denied that he had ever assured defendant that the project was coming within the budget.

Although the architectural services began in March and the first billing was May 6, 1970, no written contract was forwarded until June 23, 1970. At that time a standard American Institute of Architects (AIA) contract was forwarded, calling for payment at plaintiff's standard hourly rate and for reimbursement of expenses and recognizing that a lump sum fee for the construction phase would be negotiated prior to its commencement. The following provisions of the contract have relevance to this case:

"SCHEMATIC DESIGN PHASE

"1.1.3  The Architect shall submit to the Owner a Statement of Probable Construction Cost based on current area, volume or other unit costs."

"DESIGN DEVELOPMENT PHASE

"1.1.5  The Architect shall submit to the Owner a further Statement of Probable Construction Cost."

"CONSTRUCTION DOCUMENTS PHASE

"1.1.7  The Architect shall advise the Owner of any adjustments to previous Statements of Probable Construction Cost indicated by changes in requirements or general market conditions."

"THE OWNER'S RESPONSIBILITIES

"2.8  If the Owner observes or otherwise becomes aware of any fault or defect in the Project or non-conformance with the Con-

tract Documents, he shall give prompt written notice thereof to the Architect."

"CONSTRUCTION COST

"3.4 * * * Accordingly, the Architect cannot and does not guarantee that bids will not vary from any Statement of Probable Construction Cost or other cost estimate prepared by him.

"3.5 When a fixed limit of Construction Cost is established as a condition of this Agreement, it shall include a bidding contingency of ten per cent unless another amount is agreed upon in writing. * * *

"3.5.1 If the lowest bona fide bid * * * exceeds such fixed limit of Construction Cost (including the bidding contingency) established as a condition of this Agreement, the Owner shall (1) give written approval of an increase in such fixed limit, (2) authorize rebidding the Project within a reasonable time, or (3) cooperate in revising the Project scope and quality as required to reduce the Probable Construction Cost. In the case of (3) the Architect, without additional charge, shall modify the Drawings and Specifications as necessary to bring the Construction Cost within the fixed limit. The providing of this service shall be the limit of the Architect's responsibility in this regard, and having done so, the Architect shall be entitled to his fees in accordance with this Agreement."

"PAYMENTS TO THE ARCHITECT

"6.3 If the Project is suspended for more than three months or abandoned in whole or in part, the Architect shall be paid his compensation for services performed prior to receipt of written notice from the Owner of such suspension or abandonment, together with Reimbursable Expenses then due and all terminal expenses resulting from such suspension or abandonment."

Between June 1, 1970, and November 25, 1970, when the bids were opened, plaintiff worked actively with defendant both in the design development and construction documents phases of the project, plaintiff continuing to bill defendant on an hourly basis without objection by defendant. Although the project was

substantially increased in size and scope during this period, plaintiff did not furnish and defendant did not request any up-to-date cost projections. Significantly important changes in the project made during this period include:

(1)   Replacement of offices with examining rooms necessitating additional plumbing;

(2)   More extensive X-ray space;

(3)   A doubling of the size of the laboratory;

(4)   Addition of a sophisticated communications system;

(5)   Addition of 2,100 feet of finished space in the basement (to provide facilities originally projected for the remodeled old building);

(6)   Enlargement of the structure as follows:

| | |
|---|---|
| waiting area | 1710' to 1724' |
| first floor | 5880' to 6650' |
| basement | 6260' to 6814' |

All of the changes were discussed, approved, and understood by defendant. Defendant alleges, however, that it was under the impression that all such changes would be included in the original budget figure.

Bids were opened on November 25, 1970. The low construction bid was Kratochvil Construction Company at $423,380. Deductive alternates agreed to by defendant would bring the total low bid cost, including carpeting, down to $413,037.

Subsequent to the opening of the bids, the doctors called a meeting with Griswold at which the doctors informed Griswold that they could not complete the building according to the cost evidenced by the bids. Thereafter, Griswold met with the doctors and offered suggestions as to how the low bid figure could be reduced. Approximately $42,000 of reductions were projected, so that the final bid as reduced totaled $370,897. This figure included construction, carpeting, and remodeling of the old building and would meet the program of requirements without reducing size in any way. Griswold also pointed out to the doctors that the project cost could be further reduced by eliminating "bays"

(series of examination rooms) from the building at a saving of approximately $35,000 per bay. Defendant was willing to accept the $42,000 reduction but was not in favor of eliminating any bays from the proposed project.

From November 25, 1970, when the bids were opened, until October 12, 1971, plaintiff and defendant met and corresponded many times in connection with various possible revisions of the project. During this time defendant never indicated that the project was abandoned and in fact, in January 1971 made a payment of $12,000 on its bill.[1] During this time defendant never asked to be excused from the balance of the bill, and defendant offered to help plaintiff by paying interest on the open account if plaintiff required bank financing by reason of nonpayment. During this time defendant advised plaintiff that ground breaking would be deferred for 6 months, and that request by plaintiff for a further payment was "well taken" but that no further payment would be recommended until construction began.

The building, in fact, was never constructed. Plaintiff filed its lien on April 30, 1971, and commenced this action to enforce it in October 1971.

In analyzing the facts of this case we have considered Minnesota decisions[2] as well as decisions from other jurisdictions.[3]

---

[1] Up until November 15, 1970, plaintiff billed defendant monthly at the rates provided by the contract and for costs advanced for engineering consultation, etc. On November 19, 1970, plaintiff at its own initiative recomputed its bill of November 15, 1970, on a different basis, resulting in a reduction of $3,723.05 and leaving a balance of $31,438.65. Defendant had made payments on June 8, 1970, July 30, 1970, and September 10, 1970, and its payment of January 15, 1971, reduced the balance to $19,438.65. This bill, in addition to charges for plaintiff's services, included $453.71 for reproduction of prints, etc. (at cost) and $10,262 for consulting engineers at cost. No further charges were billed by plaintiff after November 15, 1970, and no further payments were made by defendant after January 15, 1971.

[2] See, e. g., Kostohryz v. McGuire, 298 Minn. 513, 212 N. W. 2d 850 (1973); Wick v. Murphy, 237 Minn. 447, 54 N. W. 2d 805 (1952).

[3] These decisions are collected in Annotation, 20 A. L. R. 3d 778.

From these decisions we have extracted a number of factors which we believe are relevant to a determination of what the effect on compensation of an architect or building contractor should be when the actual or, as here, probable cost of construction exceeds an agreed maximum cost figure.

One very significant factor is whether the agreed maximum cost figure was expressed in terms of an approximation or estimate rather than a guarantee. Where the figure was merely an approximation or estimate and not a guarantee, courts generally permit the architect to recover compensation provided the actual or probable cost of·construction does not substantially exceed the agreed figure.

Another significant factor is whether the excess of the actual or probable cost resulted from orders by the client to change the plans. Where the client ordered changes which increased the actual or probable construction costs, courts are more likely to permit the architect to recover compensation notwithstanding a cost overrun.

A third factor is whether the client has waived his right to object either by accepting the architect's performance without objecting or by failing to make a timely objection to that performance.

A fourth factor, applicable in a case such as this where the planned building was never constructed, is whether the architect, after receiving excessive bids, suggested reasonable revisions in plans which would reduce the probable cost. Courts have held that if the architect made such suggestions and the proposed revisions would not materially alter the agreed general design, then the architect is entitled to his fee, again provided that the then probable cost does not substantially exceed the agreed maximum cost figure.

Considering this case in light of these factors, we conclude that the trial court erred in denying plaintiff's motion for amended findings of fact, conclusions of law, and order for judgment.

First, it does not appear that plaintiff guaranteed the maxi-

mum cost figure. The trial court did not expressly state whether the agreed cost figure of $300,000 to $325,000 was an established estimate or a guarantee. However, the intention of the parties, as evidenced by the record, especially by contract provision 3.4, quoted earlier, more reasonably supports an established cost estimate than a guaranteed cost figure.

Secondly, the probable cost of the project in our view did not substantially exceed the cost figure. At trial architect Griswold testified, and Mr. Schneider agreed, that the project could be completed for approximately $360,000 to $370,000 without reducing the square footage of the project. A probable construction cost of $370,000 exceeds the agreed cost estimate maximum found by the trial court, $325,000, by only 13 percent. It seems difficult to classify such a degree of cost excess as substantial. A review of cases cited in Annotation, 20 A. L. R. 3d 778, 804 to 805, suggests that most courts would not consider such a degree of cost excess substantial.

Thirdly, we think it relevant that defendant approved substantial changes beyond the original plans. Defendant not only adopted and acknowledged these changes but was often active in advocating them (especially in expanding the X-ray facilities and changing the doctors' offices into extra exam rooms). It is true that defendant contends that it was under the impression at all times that such changes were within the original cost estimate. However, this impression seems unreasonable and unjustified in view of the scope of the changes.

Finally, we think it relevant that plaintiff showed defendant how they could reduce the cost of the lowest bid below $370,000. For example, defendant would have reduced the cost drastically by simply agreeing to eliminate one of the "bays" or a fraction of a bay from the project. Provision 3.5.1 of the contract required the parties to revise the project scope and quality if necessary to reduce the probable construction cost. While it might be against public policy to allow an architect, under such a provision, to reduce substantially the area of a proposed project, it

seems that, barring a specifically guaranteed area, a reasonable reduction in the size of the project should be allowed when necessary to meet the construction cost.

Reversed and remanded.

MR. CHIEF JUSTICE SHERAN took no part in the consideration or decision of this case.